UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **HALLIBURTON ENERGY SERVICES, INC.,** | § § § § | |
| **Plaintiff,** | § | |
| VS. | § | **CIVIL ACTION NO. 4:17-CV-00752** |
| | § § | |
| **IRONSHORE SPECIALTY INSURANCE COMPANY,** | § § § | |
| **Defendant.** | § | |

## MEMORANDUM & ORDER

This is an action for breach of an insurance contract. The parties dispute whether there is an arbitration clause that prohibits the Court from considering this case until threshold questions are resolved through arbitration. Defendant has also filed a motion to dismiss on grounds of personal jurisdiction and venue but requests that the Court first address the arbitration question. Plaintiff argues that none of these issues is arbitrable.

### I.   BACKGROUND

In November 2012, Plaintiff Halliburton Energy Services, Inc. ("HESI") and non-party Statoil ASA ("Statoil") entered an Onshore Master Services Agreement ("MSA"). Pursuant to the MSA, HESI conducted fracking operations at the Eisenbarth Well Pad, a crude petroleum and natural gas facility operated by Statoil in Ohio. An explosion occurred at the Pad in June 2014, which caused significant environmental damage. Statoil incurred costs in excess of $25 million. (Doc. No. 13 at 4.) Defendant Ironshore Specialty Insurance Co. ("Ironshore"), which had issued a Site Pollution Legal Liability Select Policy ("Insurance Policy") to Statoil, indemnified Statoil for almost $12 million of those costs. Ironshore now argues that the

Insurance Policy does not cover the $12 million it paid to Statoil, and it seeks to recover that amount from HESI through subrogation. (Doc. No. 23 at 4-5.)

HESI contends that Ironshore breached the Insurance Policy when it asserted an indemnity claim against HESI. Ironshore responds that it became subrogated to Statoil's rights under the MSA, and that HESI had agreed to indemnify Statoil for losses and damages from the accident. HESI disagrees with Ironshore's interpretation of the MSA, and seeks declaratory judgment as to whether Ironshore has waived subrogation rights against HESI. (Doc. No. 1 ¶ ¶ 25, 30-32, 36.)

Ironshore argues that this case should be stayed pending arbitration because the MSA mandates arbitration of any disputes between parties that concern issues related to the MSA, and Ironshore became such a party to the MSA through subrogation. Furthermore, Ironshore contends, the arbitration clause is triggered because the Court would need to look to the MSA to answer the questions raised in HESI's Complaint, namely if Ironshore waived its rights to subrogation.

HESI argues that, through the Insurance Policy, Ironshore waived its rights to subrogation under the MSA, and thus neither the MSA nor the arbitration clause within it applies to this dispute. HESI maintains that, even if the Court needs to consult the MSA in the course of this dispute, the case is governed by the terms of the Insurance Policy. (Doc. No. 23 at 4-8, 11-15.)

## II. ANALYSIS & RECOMMENDATIONS

There are two threshold issues invoked by the Motion to Stay:

1. Can the Court address the arbitrability of arbitrability before determining that it has personal jurisdiction over this Defendant?

2. Assuming so, is the applicability of the arbitration clause in this case an issue for the Court or an arbitrator to decide?

The Court is grateful to both parties for supplemental briefing on these difficult questions and addresses each in turn.

**1. Can the Court address the arbitrability of arbitrability before determining that it has personal jurisdiction over this Defendant?**

It is well settled that jurisdictional issues must be resolved before determining the merits of a case. *See*, e.g., *Ex parte McCardle*, 74 U.S. 506, 514 (1868) ("Without jurisdiction the court cannot proceed at all in any cause"). Plaintiff concedes that "the Supreme Court, the Fifth Circuit, and courts in this District have not addressed the specific question whether a court may decide the arbitrability of a dispute before determining that it has personal jurisdiction over the defendants," and Defendant provides no contrary authority. (Doc. No. 32 at 9; Doc. No. 31 at 3-4.) The Supreme Court has stated, though, that a federal court has leeway "to choose among threshold grounds for denying audience to a case on the merits." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (citing *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999)). *Sinochem* provides crucial guidance in this analysis; there, the Supreme Court held that a district court acted within its discretion to first decide a *forum non conveniens* motion before determining whether it had personal jurisdiction over the defendant, because "[r]esolving a *forum non conveniens* motion does not entail any assumption by the court of substantive 'law-declaring power'." *Sinochem*, 549 U.S. at 433.

The question is whether arbitrability is a merits question or a jurisdictional question. If it is a procedural question (like the *Sinochem* court found that *foum non conveniens* was), this

Court may decide it before determining that it has personal jurisdiction. If arbitrability is a merits question, the Court must first find that personal jurisdiction exists.

Plaintiff highlights two cases from trial courts within the Fifth Circuit, each suggesting that arbitrability is a merits issue. The first is *Bollinger Shipyards Lockport LLC v. Northrop Grumman Ship Sys*, which holds that subject matter jurisdiction "must be resolved before the Court may pass on the validity and scope of the arbitration clause." No. 08-4578, 2009 U.S. Dist. LEXIS 3725, at *5 (E.D. La. 2009). That is the extent of its analysis and it cites only *Sinochem*.

*Coastal Indus. LLC v. Arkel Constructors, LLC* holds that the "issue of subject matter jurisdiction must be resolved before the Court may pass on the validity and scope of the arbitration clause." No. 16-480-JJB-EWD, 2016 U.S. Dist. LEXIS 181936, at *13-14 (M.D. La. 2016). *Coastal Indus. LLC* cites only *Bollinger* and *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 93-102 (1998) ("[J]urisdictional questions ordinarily must precede merits determinations in dispositional order.").

Defendant cites two cases from trial courts within the Second Circuit suggesting that arbitrability is a threshold jurisdictional issue. *Ramasamy v. Essar Glob. Ltd.* (coincidentally) applied Texas contract law to determine whether an arbitration clause governed a dispute between a plaintiff-employee and defendant-employer, *before* it reached the motion to dismiss for lack of personal jurisdiction. 825 F. Supp. 2d 466, 469 (S.D.N.Y. 2011). The arbitrability issue there was similar to the one here. There, the defendant (the owner of the subsidiary that was the plaintiff's direct employer) was not a signatory to the employment contract at issue and argued, therefore, that the arbitration clause contained therein should not apply. Here, HESI argues that Ironshore is not entitled to arbitration because Ironshore was not a signatory to the MSA. In other words, in both cases, that which made arbitrability into a merits-like issue was

4

that it intertwined with the question of *whether the litigants were actually parties to the contract that contained the arbitration clause* (there, the employment contract and here, the MSA).

The Southern District explained that "a litigant who was not a party to the relevant arbitration agreement may invoke [the Federal Arbitration Act] if the relevant state contract law allows him to enforce the agreement" and then analyzed that state contract law to find that the arbitration clause did not apply. *Ramasamy*, 825 F. Supp. 2d at 468 (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009)). The actual interpretation of state contract law is unimportant at this stage; what matters is that the Southern District undertook its contract analysis before deciding that it had personal jurisdiction. The court explicitly stated: "Because the Court has determined the case should be dismissed in favor of arbitration, it does not reach defendant's motion to dismiss for lack of personal jurisdiction or for failure to state a claim." *Ramasamy*, 825 F. Supp. 2d at 467. In support of that procedural sequence, the opinion cites *Sinochem* ("[A] federal court has leeway to choose among threshold grounds for denying audience to a case on the merits"). *Id.* The *Ramasamy* court offered no other analysis directly in support of its decision to proceed in that order. But earlier in the case, when addressing the defendant's argument that the arbitrator – not the court – should determine whether the state contract law applied, the court characterized arbitrability as a "gateway matter" and cited the Texas case of *In re Rubiola*, which held, "Whether a non-signatory can compel arbitration pursuant to an arbitration clause questions the existence of a valid arbitration clause between specific parties and is therefore a gateway matter for the court to decide." 334 S.W.3d 220, 224 (Tex. 2011). This language implies that "the existence of a valid arbitration clause between specific parties" is a jurisdictional, rather than a merits issue.

The second opinion cited by Defendant is *In re Residential Capital, LLC*, which held simply that "it is appropriate to address the Arbitration Motions as the threshold matter [i.e., before a motion on personal jurisdiction] because resolution of those motions will moot in large part the remaining motions." 563 B.R. 756, 766 (Bankr. S.D.N.Y. 2016). It cites only *Ramasamy*.

In sum, there appears to be no binding authority that dictates the correct approach in this case. The Court therefore undertakes its own examination of whether arbitrability is a threshold jurisdictional issue (like *forum non conveniens*) or a merits issue.

The line between procedure and substance is blurry; jurisdictional issues often closely intertwine with the merits of a controversy. Plaintiff argues that the "issues surrounding the applicability of the arbitration provision – that is, whether HESI and Ironshore are actually parties to a valid arbitration agreement and, if so, whether HESI's claims are subject to its terms – necessarily require the Court to address the merits of the case." (Doc. No. 32 at 11.) Plaintiff is largely correct. The merits of this case revolve around the question of privity, with HESI arguing that Ironshore cannot enforce the MSA arbitration clause because Ironshore waived subrogation and Ironshore arguing that it assumed the arbitration (and other) MSA rights through subrogation.

Nonetheless, the Court finds that arbitrability is a procedural, jurisdictional issue rather than a merits issue.

Courts often must address significant substantive law in the course of resolving threshold procedural questions. Recently, the Fifth Circuit affirmed a district court's dismissal based on a forum selection clause before that court resolved a jurisdiction issue. *Wellogix, Inc. v. SAP Am., Inc.*, 648 F. App'x 398, 401 (5th Cir. 2016). As in this case, the forum selection clause in

6

*Wellogix* was contained within a contract and, unsurprisingly, invited issues of interpretation and enforceability that would be akin to an analysis of the arbitration clause in this case. For example, in *Wellogix*, the district court had to **interpret** the scope of the clause with reference to both the contractual text and the nature of the parties' dispute. *Wellogix, Inc. v. SAP Am., Inc.*, 58 F. Supp. 3d 766, 777 (S.D. Tex. 2014), *aff'd*, 648 F. App'x 398 (5th Cir. 2016) ("To determine whether a claim falls within the scope of a forum-selection clause, a court looks to the language of the contract"). Additionally, the court had to decide whether the clause was **enforceable** under substantive, seemingly merits-like contracts principles. *Id.* at 779 (emphasis added) ("Under the *Bremen* standard, forum-selection clauses are prima facie valid and will be enforced unless the resisting party proves that enforcement is **unreasonable**."). These exercises in interpretation and enforcement were all done *before* the district court did its subject matter jurisdiction analysis, and the Fifth Circuit affirmed it. One could easily imagine how parsing contractual language and determining contractual reasonableness – done in furtherance of procedural resolution – might blend into merits analysis. Nonetheless, the district court's approach was affirmed.

    As a hypothetical example of the procedure-substance distinction collapsing, consider a case where Plaintiff received a restraining order against Defendant while they both lived in State A. Then Plaintiff moved to State B. Now, Plaintiff complains that Defendant started harassing her after she moved to State B but Defendant insists that he has never been there and contests personal jurisdiction in State B on that basis. In such a case, the key merits question would be the exact same as the key jurisdictional question: whether Defendant had been to State B, and if so, what his contacts were while he was there. The court would unavoidably decide the merits by deciding personal jurisdiction and rightly so. Therefore, it cannot be true that treading into merits territory is a per se bar on deciding threshold jurisdictional questions.

7

In *Sinochem*, the Court described the procedural versus merits distinction as whether there has been an "assumption by the court of substantive law-declaring power." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp*., 549 U.S. at 424 (2007). This Court finds that the arbitrability of arbitrability is not such an assumption. Therefore, it will rule on the issue of arbitration before determining whether the court has personal jurisdiction.

2. **In this case, is the applicability of the arbitration clause an issue for the Court or an arbitrator to decide?**

In this case, the only relevant arbitration clause is found in the MSA and it states: "Any controversy **between the Parties** not resolved by the [mandatory initial resolution procedure] related to this Master Agreement involving the construction or application of any of the terms, covenants, or conditions of this Master Agreement or related to the Work to be provided hereunder, shall, on the written request of any one Party served by the other Party, be submitted to binding arbitration in Houston, Texas." (MSA § 13.2; Doc. No. 23-13 at 27.) (emphasis added). The MSA defines "Parties" as "Company [and] Contractor" (i.e., Statoil and HESI). (MSA § 2.1).

The Insurance Policy between HESI and Ironshore states the following: "In the event of any payment under this Policy, the Company [Ironshore] shall be subrogated to all of an Insured's rights of recovery against any person or entity, including without limitation any rights to contribution from another insurer . . . No insured shall do anything to impair, reduce, impede, prejudice, curtail or waive such rights . . . . Notwithstanding anything to the contrary in this Paragraph, the Company [Ironshore] hereby expressly waives any rights of subrogation against the following: To the extent required by **written contract**, provided that such contract was

8

entered into prior to the discovery of the Pollution Incident giving rise to Loss." (Doc. No. 12-3 at 25, 58.) (emphasis added).

The MSA states, in relevant part: "Company [Statoil] will cause its insurer to waive subrogation against Contractor Group [HESI] for liabilities Company assumes **and** shall maintain, at Company's expense, insurance coverage as set forth in Enclosure 2 of the same kind and in the same amount as is required of Contractor . . ." (MSA § 9.1; Doc. No. 12-3 at 15.) (emphasis added).

Ironshore argues: "Where, as here, **the parties** expressly incorporate the rules of the American Arbitration Association ("AAA") into the arbitration agreement, the question of whether the dispute is arbitrable must be determined by the arbitrator." (Doc. No. 31 at 4.) (emphasis added). But Ironshore and HESI were not the original "parties" to the MSA; HESI and Statoil were. The key question is whether Ironshore as a subrogee assumed the status of "party" to the MSA (or, in contrast, whether Ironshore waived subrogation, is being sued as an insurer, and thus is not a "party" to the MSA). Defendant highlights that MSA § 13.2 applies to "*any controversy* between the Parties . . . *related to* this Master Agreement . . .," and then analyzes the scope of "controversy" and "related to" but ignores the problem of "Parties." (Doc. No. 31 at 6.) (emphasis in original).

Ironshore's only claim to "party" status under the MSA is as a subrogee of Statoil. Thus, if Ironshore waived subrogation, it cannot be a party under the MSA and the arbitration clause does not apply. Therefore, the Court must determine whether Ironshore waived subrogation.

The Insurance Policy states that Ironshore waives subrogation "[t]o the extent required by **written contract** . . ." (Doc. No. 12-3 at 25, 58.) (emphasis added). As HESI admits, "[t]he "written contract" at issue here is [the MSA]." (Doc. No. 23 at 7.) And the MSA requires that

9

Statoil will "cause its **insurer** to waive subrogation against [HESI] for **liabilities [Statoil] assumes**." (MSA § 9.1) (emphasis added). In the same sentence, the MSA requires Statoil to "maintain, at [its own] expense, insurance coverage as set forth in Enclosure 2 of the same kind and in the same amount as is required of [HESI] . . . ." *Id.*

The first question is whether Ironsore is an "insurer" if it is not on the list of insurance coverage required by Enclosure 2. The Court finds that the answer is yes. The two parts of MSA § 9.1 quoted above are two different clauses. At oral argument, Ironshore's counsel even conceded, "They are two different obligations." For that reason, the subrogation waiver applies to Ironshore as an "insurer," regardless of Statoil's obligation to obtain coverage pursuant to Enclosure 2.

The second question is whether the phrase "liabilities [Statoil] assumed" in MSA § 9.1 covers the subrogation at issue here. In other words, at issue is whether Ironshore's claim as an alleged subrogee derives from liability that *Statoil* assumed or a liability that HESI assumed. Ironshore claims that, standing in Statoil's shoes, it made a claim against HESI only for the liabilities that Statoil assumed (and thus Ironshore did not waive subrogation with respect to those liabilities).

Ironshore's claim against HESI was for reimbursement for all amounts Ironshore paid to Statoil as a result of the June 2014 fire. (Doc. No. 1 at 5.) The MSA appears to be internally inconsistent with respect to fire liability.

Compare the following:

> 12.8 Blow-outs or Cratering: **Subject to Articles 12.1 and 12.4** but notwithstanding anything contained elsewhere in this Master Agreement to the contrary, [Statoil] shall release, defend, hold harmless and indemnify [HESI] against **any Claims resulting from any** blowout, **fire**, explosion, cratering or any uncontrolled well condition (including the cost to control a wild well and the removal of debris), Regardless of Fault.

> 12.1 Contractor's Indemnification of Company: [HESI] shall release [Statoil] of any liability for, and shall protect, defend and indemnify [Statoil] from and against **all Claims of every kind and character**, without limit and without regard to the cause or causes thereof or the negligence of any Party or Parties, arising in connection herewith, including during any ingress, egress, loading or unloading of personnel or cargo, arising out of any illness, bodily injury, death or loss or damage to property of any member of [HESI], Regardless of Fault.

On the face of the text, § 12.1 supersedes § 12.8, rendering § 12.8 meaningless. That is because § 12.8 is expressly "subject to" § 12.1 and § 12.1 covers "all Claims of every kind and character, without limit and without regard to the cause . . . regardless of fault." The Court can conceive of no fire-related claim that would fall under § 12.8 but not § 12.1. Therefore, § 12.1 governs the determination of whether Statoil assumed the relevant liabilities.

There is another relevant contract provision, though, and it is § 12.2. Section 12.2 is entitled "Company's Indemnification of Contractor" and contains the exact same language as § 12.1, with [HESI] and [Statoil] flipped. (MSA § 12.2.) Sections 12.1 and 12.2 together establish "knock-for-knock" indemnification, meaning that each side bears its own losses – regardless of fault or any other circumstance. Therefore, the MSA requirement for Statoil to "cause its insurer to waive subrogation against [HESI] for *liabilities [Statoil] assumes*" means that Statoil was required to cause its insurer to waive subrogation against HESI for *any losses that Statoil suffered* – because each party only assumed liabilities for its own losses. (MSA § 9.1.)

This dispute is, at its core, about the $11,937,500 reimbursement from Ironshore that Statoil received as a result of fire-related loss (an amount which Ironshore then sought to recoup from HESI through subrogation). (Doc. No. 1 at 5.) If, according to the "knock-for-knock" provisions, Statoil assumed liability for its own losses then the MSA required Statoil to cause its insurer to waive subrogation against HESI for any losses that Statoil suffered. And if that is true,

then Ironshore waived subrogation in this case through the Insurance Policy (which states that Ironshore waives any rights of subrogation "[t]o the extent required by written contract [the MSA]" (Doc. No. 12-3 at 58.) If Ironshore waived subrogation, then it never stepped into Statoil's shoes and was not a party to the MSA. If Ironshore was not a party to the MSA, it cannot invoke the arbitration clause (which applies only to disputes "between the Parties") (MSA § 13.2.) Therefore, the Court finds that there is no arbitration clause governing this case.

One question remains, however: should the entire preceding analysis (about whether Ironshore waived subrogation and thus whether Ironshore was a party to the MSA) be left to an arbitrator? There is a circularity problem here: Whether subrogation waiver is arbitrable depends on whether there is a valid arbitration clause between the parties, which depends on whether there was a subrogation waiver.

The Fifth Circuit addressed remarkably similar facts in *ASW Allstate Painting & Const. Co. v. Lexington Ins. Co*., 188 F.3d 307, 311 (5th Cir. 1999). In that case, ASW entered into a construction contract with TVO. Lexington insured TVO and then argued that it was subrogated to TVO's rights to assert claims against ASW (pursuant to the construction contract between TVO and ASW). The analogy to this case equates ASW with HESI, TVO with Statoil, Lexington with Ironshore, and the construction contract with the MSA. Lexington, as alleged subrogee, petitioned the district court to compel arbitration because the construction agreement contained an arbitration clause. The district court denied the motion to compel arbitration, saying that there remained questions of whether Lexington had standing to compel arbitration, whether there had been a valid waiver of the claim, and whether Lexington met the prerequisites for arbitration. *ASW Allstate Painting & Const. Co. v. Lexington Ins. Co*., 188 F.3d at 309. Lexington appealed and the Fifth Circuit reversed, holding that "the district court is required to summarily decide

whether there is a mutually binding contractual obligation to arbitrate the dispute between them." *Id.* at 311. The court explained further: "If the trial court determines that there is no contractual relationship between the parties requiring arbitration of a dispute between them, or that no dispute between them falls within the scope of an arbitration agreement by which they are mutually bound, the court must deny the motion to compel arbitration with prejudice." *Id.* at 311. On remand, the District Court held even more clearly: "Defendant's subrogee status, a matter which is not covered by the arbitration provision, must be determined before it can be said that Defendant is entitled to arbitrate anything with Plaintiff." *A.S.W. Allstate Painting & Const. Co. v. Lexington Ins. Co.*, 94 F. Supp. 2d 782, 787 (W.D. Tex. 2000).

The state of Texas has announced the same rule. *See In re Rubiola*, 334 S.W.3d 220, 224 (Tex. 2011) ("Whether a non-signatory can compel arbitration pursuant to an arbitration clause questions the existence of a valid arbitration clause between specific parties and is therefore a gateway matter for the court to decide").

This authority not only permits but requires this Court to decide the threshold issue of subrogation waiver in order to determine whether a valid arbitration clause existed between HESI and Ironshore.

The Court concludes that there is no valid arbitration clause between HESI and Ironshore. Accordingly, the Motion to Stay is **DENIED**.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 5th day of October, 2017.

_____
HON. KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE