**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **HALLIBURTON ENERGY SERVICES, INC.,** | § § § | |
| **Plaintiff,** | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:17-CV-752** |
| | § | |
| **IRONSHORE SPECIALTY INSURANCE COMPANY,** | § § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM AND ORDER

This is an action for breach of an insurance contract. The Court previously denied Defendant's Motion to Stay Pending Arbitration. There are two remaining grounds for dismissal of this case: personal jurisdiction and venue.[1] The Court holds that there is no personal jurisdiction over the defendant and therefore, the Motion to Dismiss must be granted.

## I.     BACKGROUND

The following facts are not in dispute.

In November 2012, Plaintiff Halliburton Energy Services, Inc. ("HESI") and non-party Statoil ASA ("Statoil") entered into the Onshore Master Services Agreement (the "MSA"). Pursuant to the MSA, HESI conducted fracking operations at the Eisenbarth Well Pad, a crude petroleum and natural gas facility operated by Statoil in Ohio. An explosion occurred there in June 2014, which caused significant environmental damage. The environmental liability costs to Statoil exceeded $25 million. Statoil sued Defendant Ironshore Specialty Insurance Company

---

[1] The Court's order denying the Motion to Stay explained why it was appropriate to rule on the arbitrability issue before determining whether there was personal jurisdiction over the defendant. (Doc. No. 33 at 3-8.)

("Ironshore") and other insurers in Texas state court to recover under various insurance policies (the "Texas Action").

In the Texas Action, Statoil claimed that Ironshore owed reimbursement to Statoil pursuant to the Site Pollution Legal Liability Select Policy (the "Insurance Policy") that Ironshore had issued to Statoil in May 2014. The Insurance Policy was procured by a surplus lines broker in Tulsa, Oklahoma. Ironshore underwrote the Insurance Policy in Louisiana. Ironshore negotiated the terms primarily in Tulsa, Oklahoma. The Insurance Policy provides for the application of New York law and for dispute resolution in New York.

Using Texas counsel, Ironshore defended itself in the Texas Action and filed counterclaims against other insurers. In so doing, Ironshore served two Texas subpoenas on HESI (one for documents and the other for corporate designee testimony) with which HESI complied.

The litigation between Statoil and its insurers was resolved in a confidential settlement agreement. As part of that agreement, Ironshore paid Statoil almost $12 million. While the settlement agreement resolved Statoil's claims against its insurers, the agreement reserved the insurers' claims against each other and required that disputes concerning the reallocation of contributions be resolved in Texas under Texas law.

The Texas Action (consisting of insurer-versus-insurer disputes) was ongoing in November 2016, when Ironshore wrote to HESI and claimed that Ironshore was legally subrogated to Statoil's interests.[2] In that letter, Ironshore requested that HESI join the Texas Action in order to streamline resolution and minimize counsel fees. HESI declined in a response

---

[2] The Insurance Policy states, in relevant part: "In the event of any payment under this Policy, [Ironshore] shall be subrogated to all of an Insured's rights of recovery against any person or entity . . . ." (Doc. No. 12, Exhibit #2 at 42.)

letter. HESI's response letter also informed Ironshore that Ironshore's demand for subrogation constituted a breach of the Insurance Policy, which waived subrogation against HESI. HESI's letter further asserted that HESI was named as an additional insured in the Insurance Policy, which meant that Ironshore was obligated to defend and indemnify HESI from and against Ironshore's own purported subrogation claim. Ironshore wrote a reply letter, which reasserted that Ironshore was Statoil's subrogee and as such, Ironshore was owed indemnification from HESI. Ironshore's reply letter also declared that HESI had failed to comply with the MSA dispute resolution procedure such that Ironshore, pursuant to the MSA, was free to commence arbitration proceedings against HESI (which, under the MSA, would have occurred in Texas).

To summarize the parties' arguments, HESI contends that Ironshore breached the Insurance Policy when it asserted an indemnity claim against HESI, because the Insurance Policy waived subrogation against HESI and in fact required Ironshore to defend HESI from such claims because HESI was named as an "additional insured." Ironshore argues that its actions were proper because, through the Insurance Policy, Ironshore became subrogated to Statoil's rights under the MSA, and HESI agreed to indemnify Statoil for losses and damages from the accident; according to Ironshore, the Texas Action settlement with Statoil triggered those rights. HESI disagrees with Ironshore's interpretation of the MSA, and seeks a declaratory judgment as to whether Ironshore waived subrogation rights against HESI and whether HESI is an additional insured under the Insurance Policy.

HESI's arguments are expressed as the following claims:

- **Count I (declaratory judgment)**: HESI seeks a declaratory judgment that Ironshore waived subrogation against HESI for amounts that Ironshore paid to Statoil under the Insurance Policy.

- **Count II (breach of contract)**: HESI seeks damages for Ironshore's breach of the Insurance Policy, which consisted of asserting a barred subrogation claim.

- **Count III (declaratory judgment)**: HESI seeks a declaratory judgment establishing Ironshore's obligation under the Insurance Policy to defend and indemnify HESI from and against the claims that Ironshore itself asserted against HESI.

- **Count IV (breach of contract)**: HESI seeks damages for Ironshore's breach of the Insurance Policy, which consisted of failing to defend and indemnify HESI.

Ironshore moved to dismiss all of HESI's claims on three grounds: (1) because the issues were arbitrable pursuant to the arbitration clause of the MSA, (2) lack of personal jurisdiction, and (3) improper venue.

In its Motion to Dismiss, Ironshore requested that this Court decide the arbitrability question before the other grounds for dismissal. The Court did, and determined that there was no valid arbitration agreement between the parties. In making that determination, the Court found that Ironshore had waived subrogation. Ironshore appealed. The appeal is pending.

The Court now addresses personal jurisdiction.

## II.     STANDARD OF REVIEW

Lack of personal jurisdiction constitutes grounds for dismissal. Fed. R. Civ. P. 12(b)(2). "Federal courts sitting in diversity may exercise personal jurisdiction over a non-resident where the state long-arm statute grants jurisdiction and the exercise of jurisdiction is consistent with federal due process." *Delgado v. Reef Resort Ltd*., 364 F.3d 642, 644 (5th Cir. 2004). "Because the Texas long-arm statute extends to the limits of federal due process, the two-step inquiry collapses into one federal due process analysis." *Johnston v. Multidata Sys. Int'l Corp*., 523 F.3d

602, 609 (5th Cir. 2008). "Obtaining personal jurisdiction over a non-resident is constitutionally permissible if: 1) the non-resident purposely availed himself of the benefits and protections of the forum state by establishing minimum contacts with the state; and 2) the exercise of jurisdiction does not offend 'traditional notions of fair play and substantial justice.'" *Lewis v. Fresne*, 252 F.3d 352, 358 (5th Cir. 2001). "Once a plaintiff establishes minimum contacts between the defendant and the forum state, the burden of proof shifts to the defendant to show that the assertion of jurisdiction is unfair and unreasonable." *Sangha v. Navig8 ShipManagement Private Ltd.*, 882 F.3d 96, 101 (5th Cir. 2018).

"Minimum contacts" can give rise to either specific jurisdiction or general jurisdiction. *Lewis v. Fresne*, 252 F.3d 352, 358 (5th Cir. 2001). Specific jurisdiction may exist "over a nonresident defendant whose contacts with the forum state are singular or sporadic only if the cause of action asserted arises out of or is related to those contacts." *Int'l Energy Ventures Mgmt., L.L.C. v. United Energy Grp., Ltd.*, 818 F.3d 193, 212 (5th Cir. 2016) (citing *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009)). In other words, such jurisdiction exists "when a nonresident defendant has purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or relate to those activities." *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co*., 517 F.3d 235, 243 (5th Cir. 2008) (internal quotation marks omitted). "A court may assert general jurisdiction over [non-resident defendants] to hear any and all claims against them when their affiliations with the State are so continuous and systematic as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (internal quotation omitted). Establishing general jurisdiction is "difficult" and requires "extensive contacts between a defendant and a forum." *Johnston*, 523 F.3d at 609.

III.   <u>ANALYSIS</u>

Ironshore maintains that Texas does not have personal jurisdiction because there is no general jurisdiction over Ironshore, nor are there sufficient minimum contacts related to this case to establish specific jurisdiction over Ironshore. (Doc. No. 12 at 13-18.) HESI counters that there is general jurisdiction, and that Ironshore purposefully availed itself of the Texas forum by virtue of its behavior in the Texas Action and by seeking indemnification from HESI. (Doc. No. 23 at 9-14.)

With respect to general jurisdiction, there is no dispute that Ironshore is not incorporated in Texas nor does it have its principal place of business in Texas. Ironshore emphasizes that it "is not licensed to sell insurance in Texas, has no Texas office, does not own property in Texas, has no Texas employees, and has no financial accounts in Texas." (Doc. No. 24 at 5.) HESI has pleaded no additional facts suggesting that Ironshore has contacts "so substantial and of such a nature as to render [it] at home" in Texas. *Daimler AG v. Bauman*, 134 S. Ct. 746, 761 (2014). In a footnote, HESI avers that Ironshore provides loss control services to Texas insureds and has possibly been involved in the Texas federal courts on 13 other occasions. (Doc. No. 23 at 14.) Such contacts would be insufficient for general jurisdiction under *Daimler.* Therefore, there is no general jurisdiction.

"Specific jurisdiction . . . depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear*, 564 U.S. at 919. "[W]here the defendant deliberately has engaged in significant activities within a State, or has created continuing obligations between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by the benefits and

protections of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76 (1985) (internal quotations omitted).

In order to assess specific jurisdiction, the Court must first determine which of Ironshore's contacts with Texas should be considered.

### 1) Factual record of Ironshore's contacts with Texas

Ironshore argues that it has no connection with Texas aside from issuing an insurance policy to Statoil, a Texas resident. (Doc. No. 12 at 14.) HESI counters that Ironshore made significant contacts with Texas *after* issuing the insurance policy. (Doc. No. 23 at 10-11.) HESI lists those contacts as:

> (1) Negotiating and settling a Texas state court action with Statoil in Texas;
>
> (2) Entering into a settlement agreement that requires the application of Texas law and obligates Ironshore to litigate its contribution claims with Statoil's other insurers in Texas state court;
>
> (3) Continuing to actively litigate those claims in Texas, including by serving two subpoenas on HESI in Texas; and
>
> (4) Sending letters to HESI through Texas lawyers requesting that HESI participate in Texas litigation and threatening to invoke the benefits of Texas arbitration.

(*Id.* at 11.)

Ironshore argues that any of its alleged contacts with Texas occurring after the loss giving rise to the dispute should not be considered. (Doc. No. 31 at 8.)

**2) Legal question of whether post-loss conduct may be considered**

The Fifth Circuit has held that "*[g]eneral* jurisdiction can be assessed by evaluating contacts of the defendant with the forum over a reasonable number of years, up to the date the suit was filed." *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 610 (5th Cir. 2008) (emphasis added). The Fifth Circuit has not directly addressed time limits for evaluating contacts for *specific* jurisdiction, but district courts within this circuit have. There is ample authority to support the proposition that post-loss, pre-filing conduct should be considered in the specific personal jurisdiction analysis. *See*, *e.g.*, *Criminal Activity Surveillance, LLC v. ADT Sec. Servs., Inc.*, No. 6:11-CV-494-LED, 2012 WL 12785032, at *2 (E.D. Tex. Sept. 27, 2012) (explaining, in the course of analyzing specific jurisdiction, that a court may "consider contacts that occurred after the complaint's filing, since it would be arbitrary to identify a single moment after which defendant's contacts with the forum necessarily become irrelevant to the issue of specific jurisdiction"); *Glazier Grp., Inc. v. Mandalay Corp.*, 2007 WL 2021762, at *8 (S.D. Tex. July 11, 2007) (discussing specific jurisdiction and explaining that "[c]ourts in the Fifth Circuit . . . [look] to facts up to the filing of the complaint . . . ."); *Mgmt. Insights, Inc. v. CIC Enterprises, Inc.*, 194 F. Supp. 2d 520, 525 (N.D. Tex. 2001).

Defendant's only citation for the proposition that post-loss contacts should not be considered is a 1990 case from the Ninth Circuit. *See Farmers Ins. Exch. v. Portage La Prairie Mut. Ins. Co.*, 907 F.2d 911, 913 (9th Cir. 1990) ("Only contacts occurring prior to the event causing the litigation may be considered.") That citation is unpersuasive in light of contrary authority from this circuit. Therefore, Ironshore's post-loss contacts with Texas will be considered in the specific jurisdiction analysis.

**3) Whether Ironshore's contacts up to the time of filing conferred personal jurisdiction**

    **a) HESI's arguments for personal jurisdiction**

HESI cites to *Latshaw v. Johnston*, 167 F.3d 208 (5th Cir. 1999) to support its argument that personal jurisdiction exists. The case involved the alleged breach of an oral partnership. The Fifth Circuit concluded that there was personal jurisdiction where the defendant "entered into an ongoing business relationship with a Texas resident (and his company) and made multiple trips and phone calls to Texas in furtherance of that relationship." *Id.* at 213. Specifically, the defendant made 26 trips to Texas, bought and sold equipment in Texas on more than 24 occasions, and made at least 37 phone calls to the plaintiff in Texas regarding their business together. *Id.* at 211. The defendant also hired a Houston law firm through which he threatened to file for an injunction. *Id.* at 212. HESI emphasizes that final detail because here, as in *Latshaw*, the defendant has seemingly demonstrated some "willingness to resort to the court system in the very state that he now claims has no jurisdiction over him." *Id.*

Ironshore argues that the *Latshaw* court gave "no indication that hiring a Texas law firm was a factor supporting the exercise of personal jurisdiction." (Doc. No. 24 at 5.) Surely, the hiring of Texas counsel was *a* factor in the court's personal jurisdiction analysis but Ironshore is correct that *Latshaw* does not hold that retaining a lawyer or threatening litigation automatically establishes personal jurisdiction. Rather, "[t]he formation of an attorney-client relationship, standing alone, does not confer specific personal jurisdiction." *Monkey Boy Graphix, Inc. v. Anton Sport, Inc.*, No. 3:08-CV-657-O (BH), 2008 WL 11349966, at *4 (N.D. Tex. Aug. 20, 2008), *report and recommendation adopted*, No. 3:08-CV-0657-O, 2008 WL 11349845 (N.D. Tex. Sept. 17, 2008). Ironshore also highlights that the *Latshaw* defendant made dozens of

business trips to Texas, which stands in "stark contrast" to the minimal time that Ironshore spent in Texas related to the Insurance Policy. (Doc. No. 24 at 5.)

HESI also cites *Con'l Ins. Co. v. Dawson*, No. 3:13-CV-4150-M, 2015 WL 1443122, *rev'd on other grounds*, 642 F. App'x 309 (5th Cir. 2016). In that case, the defendant filed a state court lawsuit against his insurer. Subsequently, the insurer's subrogee sued the defendant-insured. The defendant-insured then claimed no personal jurisdiction in the case brought by the subrogee. *Con'l Ins. Co.* cites Texas law squarely holding that "[v]oluntarily filing a lawsuit in a jurisdiction is a purposeful availment of the jurisdiction's facilities and can subject a party to personal jurisdiction in another lawsuit when the lawsuits arise from the same general transaction." *Id.* at *6 (citing *Int'l Transactions, Ltd. v. Embotelladora Agral Regionmontana SA de CV*, 277 F.Supp.2d 654, 667–68 (N.D. Tex. 2002)). The "purposeful availment" of a legal system is clear when a party chooses to file an original related action in it, as the plaintiff did in *Con'l Ins. Co*. That did not happen in the present case.

Ironshore never initiated an *original* related action in Texas, but Ironshore was named as a defendant in the related Texas state court suit brought by Statoil. Ironshore also filed a counterclaim in that action. But Fifth Circuit law is well-settled that filing a counterclaim does not automatically confer personal jurisdiction. [3] *See, e.g.*, *PaineWebber Inc. v. Chase Manhattan Private Bank (Switzerland)*, 260 F.3d 453, 461 (5th Cir. 2001) ("[T]he filing of a counterclaim,

---

[3] In litigating the Texas Action, Ironshore served two subpoenas on HESI in Texas. (Doc. No. 23, Exhibit #5.) Issuing subpoenas pursuant to a counterclaim does not change the analysis, because a defendant is allowed actively to pursue a counterclaim without waiving his objection to personal jurisdiction. *See Toshiba Int'l Corp. v. Fritz*, 993 F. Supp. 571, 573–74 (S.D. Tex. 1998) ("[T]he opinions holding that the filing of a cross-claim, counterclaim, or third-party complaint does not otherwise waive personal jurisdiction are premised on the idea that a party should be able to simultaneously protest personal jurisdiction while vigorously advocating the merits of his case.").

cross-claim, or third-party claim does not, without more, waive an objection to personal jurisdiction.").

HESI also makes the point that Ironshore sent letters to HESI through Texas lawyers, which – according to HESI – "threatened to invoke the benefits of the Texas legal system . . . ." (Doc. No. 23 at 11.) The precise content of those letters is important. Ironshore's first letter describes the mandatory dispute resolution procedure under MSA ¶ 13.1, which requires good-faith extra-judicial negotiations. (Doc. No. 23, Exhibit #6 at 3.) The letter then requests that HESI waive arbitration so that HESI can be joined in the Texas Action. *Id.* ("Ironshore believes it is in the best interest of all parties to waive arbitration rights and resolve their differences in the Lawsuit.") Ironshore's second letter to HESI, in response to HESI's refusal to participate with Ironshore in either ¶ 13.1 dispute resolution procedures or to join the Texas Action, states: "Ironshore continues to reserve all of its rights, including the right to institute arbitration at any time and to recover indemnity from HESI for the losses at issue." (Doc. No. 23, Exhibit #8 at 8.) In so stating, Ironshore reserved its rights to purposefully avail itself of Texas laws.

The personal jurisdiction standard is whether a defendant actually did purposefully avail itself of forum laws, not whether it reserved the right to do so. *See Thousand Trails, Inc. v. Foxwood Hill Prop. Owners Ass'n, Inc.*, No. CIV.A.3:98-CV-2843-D, 1999 WL 172322, at *3 (N.D. Tex. Mar. 22, 1999) ("The vast majority of the courts have held that the nonresident defendant's action in sending a demand letter to the plaintiff is insufficient to create personal jurisdiction); *see also Med-Tec, Inc. v. Kostich*, 980 F. Supp. 1315, 1329 (N.D. Iowa 1997) (citing cases). Moreover, as will be explained in greater detail below, such conduct cannot suffice to confer personal jurisdiction when the basis for that reservation of rights was an out-of-state contract.

It is worth noting that Ironshore sought a stay or dismissal of this action so that Ironshore could pursue arbitration under the MSA, which would have occurred in a Texas forum. (Doc. No. 12 at 3.) Additionally, Ironshore specifically requested that this Court address its arbitration argument before personal jurisdiction, thereby willingly submitting itself to the Court's jurisdiction for a purpose beyond the strict confines of contesting personal jurisdiction. (*Id*.) ("In the interests of efficiency and judicial economy, Ironshore respectfully submits that this Court should first address Ironshore's motion for a stay pending arbitration inasmuch as resolution of that motion would moot Ironshore's motions to dismiss based on lack of personal jurisdiction and improper venue.") Ironshore's requested order of operations was a genuine effort to efficiently *defend* the matter, not to pursue distinct Texas remedies through arbitration. "[A] party may waive any jurisdictional objections if its conduct does not reflect a continuing objection to the power of the court to act over the defendant's person." *PaineWebber Inc.*, 260 F.3d at 460 (internal quotation omitted). Ironshore's motion to stay or dismiss this case due to its arbitrability under the MSA exhibits a "continuing objection to the power of the court," which objection was ultimately grounded in Ironshore's purported subrogation rights under the out-of-state Insurance Policy. Accordingly, Ironshore's request that the Court stay or dismiss this case for its arbitrability did not waive Ironshore's objection to personal jurisdiction.

b) **Ironshore's arguments against personal jurisdiction**

Ironshore is correct that "an individual's contract with an out-of-state party alone [cannot] automatically establish sufficient minimum contacts in the other party's home forum." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985). Accordingly, the mere execution of the Insurance Policy with Texas resident Statoil would be insufficient.

Ironshore cites *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. IF P & C Ins., Ltd.*, 2005 WL 1639282, at *1 (N.D. Tex. July 13, 2005) to support its position that there can be no personal jurisdiction "where Ironshore did no policy underwriting or negotiation in Texas and the Policy is governed by New York law." (Doc. No. 12 at 15.) In *Nat'l Union Fire Ins. Co.*, an insurer sued a co-insurer for contribution under an insurance policy, alleging that the co-insurer was subject to specific jurisdiction in Texas because the claim arose out of the co-insurer's insurance contract with a Texas resident. The court relied on the following language from *Burger King* as the test for determining whether a contractual relationship establishes minimum contacts:

> It is these factors – prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing – that must be evaluated in determining whether the defendant purposefully established minimum contacts with the forum.

*Id.* at *5 (citing *Burger King*, 471 U.S. at 479).

The *Nat'l Union Fire Ins. Co.* court explained that the defendant co-insurer "could not have anticipated being haled into Texas court as a result of issuing the [insurance policy to the insured party]," and relied on the facts that the co-insurer did not negotiate the policy in Texas and that the policy was written in Swedish and governed by Swedish law. *Id.*

*Nat'l Union Fire Ins. Co.* contains similarities and differences to the present case. Ironshore argues that the "same logic applies" because Ironshore did no policy underwriting in Texas and the Insurance Policy is governed by New York law. (Doc. No. 12 at 15.) Those facts are not in dispute. Moreover, the Insurance Policy was developed and executed almost entirely out-of-state. It was procured by a surplus lines broker in Oklahoma. Ironshore underwrote it in Louisiana. And Ironshore negotiated it in Oklahoma. (*Id.* at 14.) It also provides for dispute

resolution in New York. (*Id.*) Therefore, under *Nat'l Union Fire. Ins. Co.*, the mere existence of the Insurance Policy would not be enough for personal jurisdiction.

But the Insurance Policy is not the only relevant contract in this case. There is a second relevant contract: the MSA between Statoil and HESI. The MSA was a contract between two Texas residents and it is governed by Texas law. (Doc. No. 12, Exhibit B at 27, ¶ 14.1.) While Ironshore was not a party to the MSA, Ironshore claims that it can step into the shoes of one of its parties (Statoil); that subrogation claim is the entire reason for this lawsuit.

Personal jurisdiction through actual subrogation is entirely unavailing to HESI because the Court has already found that Ironshore waived subrogation. (*See generally* Doc. No. 33.)[4] But there remains the following question, which is the crux of the entire personal jurisdiction issue in this case: did Ironshore's *attempted* subrogation to a Texas contract (the MSA) confer personal jurisdiction on Ironshore, even though the basis for that attempt was a non-Texas contract (the Insurance Policy)? This Court holds that the answer is no, for the reasons articulated below. [5]

---

[4] Before making that ruling, the Court requested supplemental briefing on whether a subrogee steps into the shoes of the subrogor with respect to personal jurisdiction. There is no controlling case law on the question. (Doc. No. 31 at 7; Doc. No. 32 at 1-2.)

[5] Ironshore also cites *Air Tropiques, Sprl v. N. & W. Ins. Co.*, No. CIV.A. H-13-1438, 2014 WL 1323046 (S.D. Tex. Mar. 31, 2014) in support of its argument for dismissal. In that case, an insured sued its insurer in the Southern District of Texas and alleged personal jurisdiction based on the insurer's underwriting and claims-handling activities in Texas. The policy was not governed by Texas law, the insurer was not a Texas corporation, the policy was not negotiated in Texas, and the insured used a non-Texas broker. The court found that there was no personal jurisdiction. Ironshore reasons, "Similarly, the Ironshore policy is not governed by Texas law, Ironshore is a foreign corporation, the broker is not located in Texas, and Ironshore did not negotiate the policy in Texas. The insurer's Texas underwriting and claims-handling activities in *Air Tropiques* were more substantial contacts than Ironshore's Texas contacts in this case, but still were insufficient as a matter of law to support general jurisdiction." (Doc. No. 12 at 15-16.) Ironshore's argument would be entirely persuasive if the Insurance Policy was the only relevant contract in this case, but again, it is not. Unfortunately, Ironshore's briefing fails to take account of Ironshore's MSA-related contacts.

### c) Whether personal jurisdiction attaches when a defendant encourages a plaintiff to join forum state litigation and seeks forum state arbitration as a subrogee to a forum-state contract

There appears to be no binding case law directly on the key question in this case, or even a case in the Fifth Circuit with comparable facts. However, a very similar problem confronted the Wisconsin Court of Appeals in *Marsh v. Farm Bureau Mut. Ins. Co.*, 505 N.W.2d 162 (Ct. App. 1993).[6]

The facts were as follows: an automobile accident occurred in Wisconsin, in which a Minnesota resident ("Marsh") was injured by a Wisconsin resident. Marsh's insurer ("Farm Bureau") was from Iowa and the insurance policy, which was designed specifically to protect Marsh from liability in Wisconsin, was drafted pursuant to Minnesota law and executed in Minnesota. Marsh sued the Wisconsin resident and the Wisconsin resident filed a counterclaim. Farm Bureau decided that it would not defend Marsh in the action (apparently because Farm Bureau did not receive timely notice of the counterclaim), but Farm Bureau sought subrogation to any award received by Marsh, as was allowed by the Minnesota insurance contract and Minnesota law. Farm Bureau also (allegedly) threatened and harassed Marsh in Wisconsin about stipulating to Farm Bureau's subrogation rights. A jury found both drivers negligent, so Farm Bureau informed Marsh that it would no longer provide benefits. Marsh then filed an action in Wisconsin alleging that Farm Bureau had acted in bad faith by failing to defend him and by wrongfully denying benefits. Farm Bureau moved to dismiss the complaint, arguing that

---

[6] The Supreme Court of Wisconsin disagreed with *Marsh* on other grounds, *see Kopke v. A. Hartrodt S.R.L.*, 629 N.W.2d 662, 672 (2001), but the *Marsh* holding with respect to personal jurisdiction and subrogation, which was grounded in principles of federal constitutional due process, is good law. Additionally, and obviously, *Marsh* does not assist in the resolution of this issue as a source of authority. But its logic is eminently reasonable and therefore adopted here.

Wisconsin lacked personal jurisdiction. Farm Bureau's motion was denied and a jury found that Farm Bureau breached its contract in bad faith, awarding compensatory and punitive damages.

Marsh appealed. Farm Bureau renewed its personal jurisdiction argument. Marsh countered that Farm Bureau's pursuit of subrogation in Wisconsin, as well as Farm Bureau's Wisconsin-based attempts to threaten Marsh into stipulating to subrogation, subjected Farm Bureau to the jurisdiction of Wisconsin.

The appellate court reasoned (in relevant part) as follows:

> The contract made a future lawsuit to defend Marsh in Wisconsin a foreseeable, and highly likely, event. However, an agreement to defend Marsh in Wisconsin does not imply an agreement to be sued by him in Wisconsin. The insurance contract does not evince a purposeful availment of the benefits of doing business in Wisconsin.
>
> . . .
>
> Farm Bureau's subrogation opportunity was based on a Minnesota contract enforceable under Minnesota law. The fact an accident occurring outside Minnesota triggered Farm Bureau's right to seek subrogation does not suggest Farm Bureau availed itself of the laws and benefits of Wisconsin.

*Id.* at 167 (internal citations omitted).

In response to Marsh's argument that Farm Bureau threatened and harassed Marsh in Wisconsin "to get him to stipulate to Farm Bureau's subrogation interest," the court explained:

> [T]he alleged threats and failure to defend Marsh in Wisconsin are not sufficient contacts to warrant jurisdiction. While these acts occurred in Wisconsin, they should not be characterized as doing business in Wisconsin; Farm Bureau did not purposefully avail itself of the laws and benefits of our state, but rather came here to protect its rights as guaranteed by a Minnesota contract and Minnesota law. Finding that these slim contacts comport with due process might open our courts to countless lawsuits by nonresident insureds upset by their insurer's handling of their lawsuit and who wish to avail themselves of the benefits of Wisconsin's laws for breach of contract.

*Id.* at 166-7.

Marsh also argued that the insurance contract specifically required Farm Bureau to defend and indemnify Marsh in Wisconsin. In response, the court cited the Arizona Supreme Court's holding in *Batton v. Tennessee Farmers Mut. Ins. Co.*, 736 P.2d 2 (1987) that an "insurance company's agreement to defend and indemnify its insured in any state [does] not imply an agreement to be sued by its insured in any state." *Id.* at 166.

The reasoning above applies here. *Marsh*, like the present case, and presumably like every subrogation case, deals with two sources of liability. There is: (1) an insurance contract guaranteeing subrogation rights and (2) a vehicle through which those subrogation rights would be exercised. In *Marsh*, the vehicle was the Wisconsin jury trial between the plaintiff (Minnesota driver) and the Wisconsin driver; in the present case, it was the MSA between Statoil and HESI. In both cases, the insurance contract and the subrogation vehicle were each governed by different states' laws, and the forum state was the same as the subrogation vehicle, not the insurance contract.

In other words, in *Marsh*, the insurance contract was a Minnesota agreement. Based on the defendant's rights in that contract, the defendant sought subrogation to a Wisconsin jury award. The forum state was Wisconsin. In the present case, the Insurance Policy was a New York agreement and based on Ironshore's rights in that Policy, Ironshore sought subrogation to the MSA (a Texas agreement). The forum state is Texas.

*Marsh* holds that, when an out-of-state insurance contract grants subrogation rights to a forum state vehicle, and an out-of-state defendant pursues those rights in the forum state, there is no personal jurisdiction because the defendant only purposefully availed himself of the laws and benefits of the insurance contract state, not the subrogation vehicle state. This is true, according

to *Marsh*, even when an insurance contract specifically provides coverage in the forum state and memorializes a defendant's promise to defend and indemnity the plaintiff in the forum state.

Here, the Insurance Policy was not a Texas contract. Yet HESI's claims derive from the subrogation claim that Ironshore made *pursuant to that policy*. *See*, *e.g.*, Doc. No. 1 at 9 ("Ironshore breached the Insurance Policy by asserting that it is subrogated to Statoil's rights under the MSA . . . ."); *id.* at 10 ("Ironshore breached the Insurance Policy by failing to defend and indemnify HESI from and against the claims that Ironshore itself has asserted against HESI . . . .") The language of HESI's own claims makes clear that it is Ironshore's conduct *as a party to the Insurance Policy* – conduct which was governed by New York law and which was directed towards the vindication of rights that had been negotiated entirely outside of the Texas legal system – that forms the crux of this case. This case is not a result of Ironshore affirmatively pursuing the benefits of the Texas legal system but rather it arose from Ironshore participating in the Texas legal system only to the extent that was necessary to protect benefits that were (allegedly) sought, secured, and governed under foreign law. Even though Ironshore encouraged HESI to join Texas litigation and moved to take advantage of Texas arbitration, the opportunity and the impetus for those actions came entirely from out-of-state. In sum, the only reason that Ironshore came to Texas was to *defend* its (alleged) rights that were obtained (if at all) under foreign law – not to originate affirmative litigation based on Texas rights and obligations. Something more than that is required for minimum contacts.

HESI makes the subtle intimation that Ironshore's subrogation claim derived not from the Insurance Policy but from the Texas state settlement between Ironshore and Statoil. (*See* Doc. No. 23 at 5 ("Ironshore, acting through its Texas counsel, wrote to HESI's Texas counsel to assert that Ironshore is legally subrogated to Statoil's interests *as a result of settling Statoil's*

*claims in the Texas Action*, and that Ironshore's subrogation rights against HESI far exceed the sum of $5 million.") (internal quotations omitted; emphasis added).) The full quote from Ironshore's demand letter is as follows: "Ironshore has settled Statoil's claims against Ironshore. *As such*, Ironshore is legally subrogated to Statoil's interests, and its claims against others, for the losses at issue. *As the legal successor to Statoil's interests and claims*, Ironshore provides this notice and demand to Halliburton that Halliburton is obligated to indemnify Ironshore, as Statoil's successor in interest, for the losses at issue . . . ." (Doc. No. 23, Exhibit #6 at 2 (emphases added).) As the emphasized text makes clear, both the Texas Action settlement and the Insurance Policy were necessary to Ironshore's subrogation claim and neither alone was sufficient. The Insurance Policy established Ironshore's rights and the settlement activated them. Ironshore's briefing also demonstrates that point. (*See* Doc. No. 13 at 2 ("Ironshore, *under its Site Pollution Incident Legal Liability Select ("SPILLS") policy* issued to Statoil, paid some $12 million to Statoil in connection with Statoil's insurance claim . . . *As a result of its insurance payment* to Statoil, Ironshore became subrogated to Statoil's rights against HESI in connection with that loss.") (emphases added).) The Court need not delve too deeply into the finer points of causation to conclude that the more powerful source of asserted subrogation rights was the Insurance Policy, not the Texas Action settlement. To conclude otherwise would be to subject every defendant to personal jurisdiction in any state where an incident triggering his rights occurred, which would nullify the entire doctrine of purposeful availment.

"Due process requires that the defendant have minimum contacts with the forum state (i.e., that the defendant has purposely availed himself of the privilege of conducting activities within the forum state) and that exercising jurisdiction is consistent with traditional notions of fair play and substantial justice . . . Once a plaintiff establishes minimum contacts between the

19

defendant and the forum state, the burden of proof shifts to the defendant to show that the assertion of jurisdiction is unfair and unreasonable." *Sangha v. Navig8 ShipManagement Private Ltd.*, 882 F.3d 96, 101 (5th Cir. 2018). This Court need not reach the question of whether jurisdiction is fair and reasonable because Ironshore lacked sufficient minimum contacts with Texas. Therefore, this case must be dismissed for lack of personal jurisdiction.

## IV.    JURISDICTIONAL DISCOVERY

Plaintiff has requested jurisdictional discovery in the event that the Court should make an initial determination that Texas lacks personal jurisdiction. Jurisdictional discovery is within the discretion of a trial court. *See Patterson v. Dietze, Inc.*, 764 F.2d 1145 (5th Cir. 1985); *Wyatt v. Kaplan*, 686 F.2d 276, 283 (5th Cir. 1982). "The Fifth Circuit affirms denials of discovery on questions of personal jurisdiction in cases where discovery sought could not have added any significant facts." *Baker Hughes Inc. v. Homa*, No. CIV.A. H-11-3757, 2012 WL 1551727, at *12 (S.D. Tex. Apr. 30, 2012) (*citing Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 221 (5th Cir.2000)) (internal quotation marks omitted). After careful consideration of the record, the Court concludes that the existence of minimum contacts in this case is primarily a question of law. Discovery would not add any facts significant enough to change the analysis. The request for jurisdictional discovery is therefore **DENIED.**

## V.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Ironshore's Motion to Dismiss for Lack of Personal Jurisdiction.

The Motion to Dismiss for Improper Venue and the Motion for Protective Order are **DENIED AS MOOT.**

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this the 26th day of March, 2018.

_____

 HON. KEITH P. ELLISON
 UNITED STATES DISTRICT JUDGE